FILED

2016 Sep-21  AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **MARK JONES,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:15-CV-00790-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On February 7, 2012, the claimant Mark Jones applied for Social Security disability

insurance benefits.  (R. 56).  The claimant alleged disability commencing on September 9, 2011,

because of high blood pressure, an enlarged heart, and back problems.  (R. 87).  The

Commissioner denied the claims initially on April 5, 2012.  (R. 26).  The claimant filed a timely

request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on

October 1, 2013.  (R. 43).

In a decision dated November 21, 2013, the ALJ found that the claimant was not disabled

as defined by the Social Security Act and, thus, was ineligible for Social Security disability

insurance benefits.  (R. 66).  On March 11, 2015, the Appeals Council denied the claimant's

request for review; consequently, the ALJ's decision became the final decision of the

Commissioner of the Social Security Administration.  (R. 1).  The claimant has exhausted his

administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1631(c)(3).  For the reasons stated below, this court AFFIRMS the decision of the

Commissioner.

## II.  Issues Presented

The claimant presents the following issues for review:

(1)    whether substantial evidence supports the ALJ's finding that the claimant does not meet Listing 12.05 for disability;

(2)    whether the ALJ improperly disregarded Dr. Storjohann's opinion and substituted his own;

(3)    whether the ALJ erred by failing to complete a Psychiatric Review Technique Form or incorporate the form's analysis into his decision; and

(4)    whether substantial evidence supports the ALJ's use of the Medical-Vocational Grids without posing a hypothetical to the vocational expert to find that jobs existed in the national economy that the claimant could perform.

## III.  Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

substantial evidence supports the factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*,

129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No … presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826

F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*.

The court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42

U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

Regarding an intellectual disability, the law requires that the claimant "(1) ha[s]

significantly subaverage general intellectual functioning; (2) ha[s] deficits in adaptive behavior;

and (3) ha[s] manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120

F.3d 1217, 1219 (11th Cir. 1997); *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 12.05.  A

claimant's mental retardation is sufficiently severe to constitute a disability when it meets the

requirements of Listing 12.05 C *or* D. Under Listing 12.05C, a claimant must have a valid verbal,

performance, or full scale IQ ranging from 60 to 70, and an additional mental or physical

impairment imposing an additional work-related limitation on function. Under Listing 12.05D, a

claimant must have a valid verbal, performance, or full scale IQ ranging from 60 to 70, resulting

in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

difficulties in maintaining social functioning; or (3) marked difficulties in maintaining

concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended

duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05D.

The Eleventh Circuit, however, also has determined that an ALJ is not required to base a

finding of mental retardation on the results of an IQ test alone when he evaluates whether a

claimant meets the requirements of Listing 12.05.  *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th

Cir. 1986); *see also Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case

law "requir[es] the Secretary to make a finding of mental retardation based *solely* upon the

results of a standardized intelligence test in its determination of mental retardation"). An ALJ is

required to base his determination of mental retardation on the combination of intelligence tests

and the medical reports. ALJs evaluate intelligence tests "to assure consistency with daily

activities and behavior." *Popp*, 779 F.2d at 1499. If intelligence tests are inconsistent with the

medical record and/or the claimant's daily activities and behavior, good cause exists that the ALJ

should discredit the intelligence tests. *Popp*, 779 F.2d at 1500; *see also Lowery v. Sullivan*, 979

F.2d 835, 837 (11th Cir. 1992) (finding that a valid IQ score need not be conclusive of mental

retardation when the IQ score is inconsistent with other evidence in the record concerning the

claimant's daily activities and behavior).  When the evidence conflicts, "it is the ALJ's

responsibility, not the Court's, 'to reconcile inconsistencies in the medical evidence.'" *White v.

Astrue*, 2012 U.S. Dist. Lexis 44494, *14 (W.D.N.C. 2012) (quoting *Seacrist v. Weinberger*, 538

F.2d 1054, 1056-57 (4th Cir. 1976)).

The ALJ commits reversible error and abuses his discretion to make a determination of

disability when he disregards medical evidence in favor of his own impressions.  *Marbury v.*

*Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring)("An ALJ . . . abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians."). In other words, the ALJ may not substitute his judgment for the judgment of the physicians and draw his own conclusions about the claimant's medical conditions. *Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986).

As to mental impairments, the ALJ must base his evaluation on the "special technique" dictated by the Psychiatric Review Technique Form (PRTF). *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005); 20 C.F.R. § 404.1520a-(a). The "special technique" requires an evaluation of the impact of the claimant's mental impairment on (1) activities of daily living (ADLs); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Moore*, 405 F.3d at 1213. Failure to either complete the PRTF and append it to the ALJ's opinion, *or* to incorporate the PRTF's "mode of analysis" into the ALJ's decision constitutes reversible error. *Moore*, 405 F.3d at 1214.

After determining that the claimant cannot perform his past relevant work, the ALJ must articulate specific jobs that the claimant is able to perform, and substantial evidence must support this finding, not mere intuition or conjecture. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *see also Allen v. Sullivan* 880 F.2d 1200, 1201 (11th Cir. 1989). The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by applying the Medical-Vocational Grids *or* by use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004). When a claimant can perform a *full range* of work at a given level of exertion and has no nonexertional impairments that significantly limit basic work skills, an ALJ's exclusive reliance on the Medical-Vocational Grids to support a finding of nondisability is

appropriate. *Id*. at 1242; *see also Wilson*, 284 F.3d at 1227; *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).

A *full range* of work means that the claimant is able to do *unlimited* types of work at the given exertional level. *Phillips,* 357 F.3d at 1241 (emphasis added). Nonexertional limitations involve those limitations "other than strength demands," including difficulty maintaining attention or concentration and difficulty understanding or remembering detailed instructions. 20 C.F.R. § 404.1569a. Borderline intellectual functioning could be a factor in finding that a claimant's intellectual impairments significantly limit basic work skills. However, having borderline intellectual functioning alone does not prove a nonexertional limitation that significantly limits basic work skills. *See Jordan*, 470 F. App'x at 770.

 If nonexertional impairments exist that significantly limit basic work skills, the ALJ may use Grids as a framework to evaluate vocational factors, but *must* also introduce independent evidence, preferably through a vocational expert's testimony, of the existence of jobs in the national economy that the claimant can perform. *Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996) (emphasis added). Also, for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Comm. of Social Security*, 265 F.3d 1214, 1220 (11th Cir. 2001); *see also Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).

## V. FACTS

The claimant has a tenth grade education and was forty years old at the time of the administrative hearing. (R. 74). His past work experience includes employment as a poultry dressing worker and live hanger. (R. 65). The claimant alleges that he cannot work because of

high blood pressure, an enlarged heart, and back problems, with an onset date of September 9, 2011.  (R. 87).  The claimant was last employed in 2008 at Keystone Foods Co. but was fired because of conflict with his boss.  (R. 180, 190).

*Physical Limitations*

On August 12, 2005, Dr. Virenjan Narayan, of the Riverview Regional Medical Center, indicated that the patient had undergone a left cardiac catheterization, selective coronary arteriography, left ventriculography, aortography, and bilateral renal arteriography.  Dr. Narayan noted that the claimant had a known history of uncontrolled hypertension and found that the claimant had "normal-appearing" coronary arteries, normal left ventricular systolic functioning, normal aortography, and normal bilateral renal arteries.  (R. 237-239).

On January 13, 2010, the claimant sought treatment at the Riverview Regional Medical Center Emergency Department for back, pelvic, and hip pain, which he rated a five on a scale of one to ten.  His blood pressure was 200/105.  Dr. Gary A. Moore ordered x-rays of the claimant's lumbar spine, pelvis, and right hip, and the results indicated mild degenerative lumbar disk disease; no remarkable abnormalities in the claimant's pelvis; and nothing abnormal in his right hip.  Dr. Moore's clinical impression was "Osteoarthritis Pain, right hip," and he prescribed Ultram and Naprosyn for the claimant's hip pain, and told him to take Aleve when those prescriptions ran out.  The claimant agreed to follow-up with his primary care physician Dr. Pranav Mishra.[2]  (R. 251-257).

On March 25, 2010, at 11:15 AM, the claimant presented to Quality of Life Health

---

[2]  The court found no medical records from Dr. Mishra regarding a follow-up visit after January 13, 2010; in fact, the court found no medical records from Dr. Mishra in the court record for any time period.

8

Services complaining of a swollen right eye, sinus drainage, and a headache.  Deborah Pullen,

CRNP, tested the claimant's blood pressure at 190/125 and 196/142.  (R. 295-298).  At 1:14 PM

that same day, the claimant presented to Gadsden Regional Medical Center with accelerated and

out of control hypertension, with a blood pressure of 225/137, a right swollen upper eyelid, and a

headache.  Dr. Vinol Bansal noted that the claimant had not taken his prescribed blood pressure

medication in over six months; emphasized the importance of taking his blood pressure

medication; and prescribed Lisinopril and Clonidine for his high blood pressure.  Dr. Bansal

referred him to Dr. Tariq Muhammad with Quality of Life Health Services for a follow-up visit.

(R. 278-285).

On March 29, 2010, the claimant returned to Quality of Life Health Services for a follow-

up, and his blood pressure was 158/118.  Nurse Practitioner Pullen added a prescription for

Exforge for the claimant's high blood pressure and referred the claimant to Dr. Charles T. Sirna

of Cardiology Consultants of Northeast Alabama because of an abnormal EKG while the

claimant was in the hospital.  (R. 366-370).

The claimant presented to Dr. Sirna at Cardiology Consultants of Northeast Alabama on

April 8, 2010.  Dr. Sirna ordered an Echocardiogram that showed  severe left ventricular

hypertrophy that "would strongly suggest diastolic dysfunction probably on the basis of

uncontrolled HTN."  Dr. Sirna told the claimant to "slowly back off on the Clonidine or even

eliminate it completely as long as his BP remains less than 160/110."  (R. 441-443).

On May 4, 2010, the client presented to Dr. Sirna for a follow-up.  The claimant's blood

pressure was 160/100, which Dr. Sirna described as "slightly accelerated."  The claimant

indicated that his blood pressure is "high in the morning but then gets down to normal during the

day." Dr. Sirna told the claimant to continue using the Clonidine, Lisinopril as prescribed, but increased the dosage of Procardia XL to control his blood pressure.   (R. 440).

From July 29, 2010 to September 18, 2013. he returned to Quality of Life Health Services approximately twenty-six times, fourteen of which were related to blood pressure checks or other blood pressure concerns, such as foot and eye swelling. (R. 375, 378, 397, 402, 404, 424, 428, 456, 460, 465, 514, 563, 573, 601).  At thirteen of those twenty-six visits, the claimant's blood pressure was below 150/100. At the other thirteen visits, his blood pressure averaged in the 150/100 range, and registered over 160/100 on only one occasion on February 13, 2012. Between 2010 and 2013, doctors adjusted his blood pressure medications, which included adding Hydrochlorothiazide and Flexeril in July 2010 (R. 376).  On April 4, 2013, CRNP Carol James replaced Hydrochlorothiazide with Maxzide, replaced Procardia XL with Norvasc, and added Coreg on June 12, 2013 to control his high blood pressure.  (R. 565).

Regarding the claimant's back pain, he first presented to Quality of Life Health Services for back pain on March 1, 2011.  (R. 385, 561).  Nurse Practitioner Pullen saw the claimant that date and did not prescribe any new medication.  (R. 387).  The plaintiff returned to Quality of Life Health Services citing back pain ten times between May 2, 2011 and September 18, 2013. (R. 392, 406, 411, 424, 428, 456, 506, 510, 514, 601).  On May 2, 2011, Ms. Pullen noted, and included in all subsequent visit records, that the claimant suffered from chronic myalgia and myosotis, which involves painful, inflamed muscles.  (R. 392, 397-601).

On August 22, 2011, Dr. Sathyan V. Iyer examined the claimant at the request of the Disability Determination Service.  Dr. Iyer observed that the claimant had high blood pressure since he was thirteen years old.  Dr. Iyer indicated that the claimant suffered from chronic

10

hypertension that was not well-controlled; had a history of left ventricular hypertrophy; and was overweight. Dr. Iyer noted that the claimant did not appear to have any significant physical limitation, and that the underlying medical condition may require monitoring. (R. 558-559).

On February 13, 2012, CRNP Deborah Thompson indicated that the claimant's back pain was improving, and that its "[s]everity level is mild." The claimant described his mild back pain as an "ache" and indicated that lifting heavy objects, twisting, walking, climbing stairs, chancing positions, and daily activities aggravate his pain. Regarding his blood pressure, the claimant reported that his symptoms from his high blood pressure are severe and occur daily, but that he "is taking [his] medications as prescribed" and his medications are a "relieving factor[]." (R. 424).

On March 8, 2012, the claimant completed a function report at the request of the Social Security Administration. He indicated that he has good and bad days regarding his back pain. If he is feeling "alright," he goes on a two to three mile walk after breakfast; takes a shower; sits on the porch for fifteen or twenty minutes; takes a nap for an hour or so; and helps his girlfriend take care of their kids by feeding them, clothing them, and helping them with their homework. The claimant also stated that he sometimes visits his mom and they "sit around and play games for awhile"; loads washer and dryer every other week; irons every other week; cannot bend over too long; can stand five minutes; has trouble sometimes walking thirty minutes; gets mad easily; and has trouble understanding what he reads. He also stated that he has trouble getting along with others, and that he was fired from Tyson and Keystone because he and his supervisors "had words." The claimant admitted that he could pay bills; count change; handle a savings account; use a checkbook and money orders; follow written instructions "pretty good"; follow spoken

11

instructions well if the instructions were "good, slow, [and] clear"; and pay attention for fifteen to twenty minutes and can finish what he starts.  (R. 201-209).

On March 15, 2012, the claimant completed a cardiovascular questionnaire at the request of the Disability Determination Services.  The claimant indicated that he walked four to five days a week; could walk two to three miles in forty-five minutes to an hour on a good day; sometimes has discomfort walking because of his backache; and has discomfort if he stands or sits too long. (R. 199-200).

On April 14, 2012, the claimant presented to Riverview Regional Medical Center with hip pain, and Dr. Ross W. Barnett treated him.  (R. 450).  An x-ray of his hip indicated no abnormalities.  (R. 446).  Dr. Jere M. Disney prescribed Motrin, Zanaflax, and Ultram for the pain.  (R. 449).

On June 12, 2012, Dr. Gurcharan Singh performed a Physical Residual Functional Capacity Assessment of the claimant at the request of the Social Security Administration.  Dr. Singh reviewed the claimant's medical records and found that the claimant could occasionally lift and/or carry fifty pounds; could frequently lift and/or carry twenty-five pounds; could stand, walk, and/or sit about six hours in an eight-hour workday; and had unlimited ability to push and/or pull.  Dr. Singh stated that the medical evidence of record revealed that the claimant's hypertension was stable and "doing well with medication."  He also noted that his medical records in 2011 showed a full range of motion "in all major joints without restrictions" and that the claimant did not seem to have significant physical limitations.  (R. 469-471).

On January 3, 2013, the claimant presented to the Emergency Room of the Riverview Regional Medical Center complaining of back pain.  Dr. Abeyomi Oshinowo noted the

claimant's chronic back pain and prescribed Flexeril, Lortab, and Medrol for the pain. (R. 530-531). The claimant again presented to Quality of Life Health Services on January 4, 2013 concerning his back pain. CRNP Carol James noted that the claimant desired to get an MRI of his back but had no insurance and could not afford the test. (R. 514).

At a June 12, 2013 check up at Quality of Life Health Services, the claimant indicated that, regarding his back pain, he "has Flexeril at home but 'rarely takes one.'" (R. 576).

The claimant returned to Quality of Life Health Services on August 7, 2013 for a blood pressure follow-up, and his blood pressure was 147/100. He claimed to have no headache or dizziness, but stated that he had been out of Coreg for five days. The claimant indicated that his Flexeril helps him sleep at night, but he does not take his pain medication during "waking hours." Nurse Practitioner James discussed with the claimant the importance of a low salt diet and encouraged him to exercise thirty to sixty minutes three to five times weekly. (R. 594-597).

When the claimant returned to Quality of Life Health Services on September 18, 2013, his blood pressure was 158/105, and he admitted to eating ham for three days prior to the appointment. The claimant's treatment plan included eating a low salt diet and avoiding eating pork; exercising thirty to sixty minutes three to five times weekly; and returning for a blood pressure check in two weeks. (R. 601-605).

*Mental Limitations*

The claimant transferred from Gadsden City High School to the Etowah County School System on August 27, 1990, after completing ninth grade. (R. 226). The Etowah County Special Education Department noted that the claimant transferred into the Etowah County School System as EMR (Educable Mentally Retarded). (R. 226). The claimant's Gaston High School records

show participation in English EMR, Biology EMR, and Health EMR during tenth grade. (R. 220). The claimant withdrew from school on April 1, 1992. (R. 226).

On July 29, 2013, the claimant presented to Dr. Robert A Storjohann for a Psychological Evaluation upon referral from the claimant's attorney. (R. 580). Dr. Storjohann administered a WAIS-IV and a WRAT4. (R. 580). The claimant obtained a Verbal Comprehension Index (VCI) of 63, which placed him in the first percentile and in the extremely low range. The claimant also scored a Perceptual Reasoning Index of 90, Working Memory index of 80, Processing Speed index of 89, and a Full Scale IQ of 76. (R. 580). The scores placed the claimant's overall abilities in the borderline range. (R. 581). On the WRAT4, the claimant's scores placed him in the low range of word reading, sentence comprehension, and overall reading skills. (R. 581). Dr. Storjohann noted that these scores indicate "limited overall reading skills which is consistent with the results of the WAIS-IV and his reported academic history." (R. 581).

*The ALJ Hearing*

At the hearing on October 1, 2013, the claimant testified that he performed various jobs at Keystone Foods, including batching, weighing meat, dumping it on a scale, and putting it in a box. Regarding his previous employment at Tyson, the claimant stated that he stacked 50-60 pound tubs and did live hanging of chickens. (R. 75-76).

The claimant testified that he cannot work because of high blood pressure and arthritis in his neck and back. The claimant affirmed that he currently takes four medications for high blood pressure. (R. 77).

Regarding his daily functioning, the claimant testified that he helps his kids with their

14

homework, tries to walk, and tries to help his mom by cutting the grass.  The claimant also testified that his medications make him drowsy and that he typically sleeps after he takes them. (R. 78-79).

Regarding his back and neck pain, the claimant stated that the pain is constant and that it is "mostly in the mornings when I get up."  He testified that he has good and bad days and described a bad day as not being able to do anything and lying in bed all day.  He stated that his pain would not keep him from working a job if he did not also have high blood pressure.  The claimant testified that he did not get MRIs on his neck and back because he could not afford it. He also testified that the neck and back pain can be attributed to his arthritis.  (R. 79-81).

The vocational expert Mr. Long testified that the claimant's previous jobs included a poultry dressing worker, which is heavy and unskilled, and a live hanger, which is medium and unskilled. (R. 82). The ALJ did not give Mr. Long any hypothetical.

However, the claimant's attorney asked Mr. Long to consider a hypothetical individual with the claimant's same profile who needed two unscheduled fifteen to twenty minute breaks during the work day.  Mr. Long indicated that this hypothetical individual would not be able to "do competitive work" because of these needed breaks.  The claimant's attorney further inquired about a hypothetical with the claimant's profile who was distracted by drowsiness and pain to the point that he could not complete tasks.  Mr. Long indicated that such an individual would not be able to "sustain competitive employment."  (R. 83).

*The ALJ Decision*

On November 21, 2013, the ALJ determined that the claimant was not disabled under the

Social Security Act.  (R. 66).  The ALJ found that the claimant had not engaged in substantial gainful activity since the application date.  (R. 58).

The ALJ found that the claimant suffered from severe impairments of hypertension, mild degenerative disc disease of the cervical spine with cervicalgia, mild degenerative disc disease of the lumbar spine with lumbago, and obesity.  (R. 58).  However, he stated that none of the claimant's impairments, singly or in combination, manifested the specific signs and diagnostic findings required by the Listing of Impairments.  (R. 59).

The ALJ noted that hypertension should be considered in reference to other body systems and that no evidence exists in the record that "the claimant's high blood pressure has affected other body systems."  The ALJ also noted that obesity should be considered in reference to potential impairments of other body systems such as the "musculoskeletal, respiratory, and cardiovascular systems."  He then noted that the claimant alleged no limitations from his obesity and no physician has "placed any restrictions on the claimant" because of his obesity.  (R. 59-60).

The ALJ noted a diagnosis of depression in the record by a nurse practitioner, who the ALJ stated was not an acceptable medical source under Social Security regulations. The ALJ also pointed to the claimant's Function Report where the claimant did not allege any significant mental impairments or limitations; noted that the claimant did not testify at the hearing that he has any limitations from depression; and stated that the claimant, at most, alleged generally that he has little difficulty understanding, completing tasks, and sometimes does not get along with others.  Specifically, the ALJ, in incorporating the Psychiatric Review Technique in his decision, found that the "[c]laimant has no restrictions of activities of daily living; no difficulties maintaining social functioning; and no difficulties maintaining concentration, persistence, or

pace related to depression. Nor is there evidence of any episodes of decompensation, each of extended duration." (R. 58-60).

In assessing the claimant's mental and intellectual impairments, the ALJ recognized that the claimant reported a history of special education and that he transferred to Etowah County Schools as EMR. However, the ALJ also noted that the education records did not include any "determinations of eligibility for special education or Individualized Education Programs (IEPs)." (R. 60). He also noted that the claimant never claimed that an intellectual disability limited his ability to work.

The ALJ also noted the psychological evaluation of Dr. Storjohann upon attorney referral. (R. 60). He noted that Dr. Storjohann saw the claimant for the purpose of a single evaluation rather than longitudinal treatment. (R. 60). The ALJ referenced the IQ scores determined by Dr. Storjohann's administration of the WAIS-IV and conclusion that the claimant's abilities are in the borderline range. (R. 60-61). The ALJ emphasized that the claimant only had one score between 60 and 70 and posited that the disparity between the Verbal Comprehension Index and the rest of the scores was more indicative of a learning disability. (R. 61). The ALJ also noted Dr. Storjohann's administration of the WRAT-IV and conclusion that the claimant has "limited overall reading skills." (R. 61).

The ALJ also specifically considered Listing 12.05(C) but found that "the claimant does not exhibit the degree of deficits in adaptive functioning needed to support a finding under Listing 12.05. (R. 61). He reasoned that the evidence showed that the claimant worked for a number of years "at the substantial gainful activity level"; is in a committed relationship that includes caring for children; and has no limitation on daily living caused by any intellectual

deficits.  (R. 61).  The ALJ concluded that the claimant "has the non-severe impairment of borderline intellectual functioning."  (R. 61).  The ALJ also stated that no evidence in the record exists of any sustained limitation of function because of intellectual functioning.  (R. 61).

Regarding whether the claimant has the residual functional capacity to do work, the ALJ noted that the claimant's March 2012 Function Report indicates daily activity consistent with sedentary work.  (R. 62).  The ALJ also noted the claimant's testimony indicating that, if he feels "alright," he takes a two and a half to three mile walk each day.  (R. 62).  The ALJ also stated that the objective medical evidence does not support the claimant's testimony of limitations in standing five minutes, walking for thirty minutes, and sitting for thirty minutes.  (R. 62).  To support this conclusion, the ALJ noted that the claimant testified that he walked four to five days a week for exercise in his March 2012 Cardiovascular Questionnaire.  (R. 62).

The ALJ also noted that, while the claimant testified that his blood pressure medications make him drowsy, no evidence exists in the record that the claimant complained of drowsiness or other side effects to his primary care providers.  (R. 62).  Additionally, the ALJ stated that the claimant's March 12 Function Report did not indicate "significant drowsiness."  (R. 62).  The ALJ also noted that the claimant "did not specifically testify [at the hearing] to any limitations on standing, walking, or sitting."  (R. 62).

The ALJ concluded that the medically determinable impairments could cause some of the alleged symptoms, but the record does not support the degree of limitation expressed by the claimant concerning intensity or persistence of limitations.  (R. 62).  In supporting this conclusion, the ALJ noted that the claimant stated that he stopped working in 2008 because of problems with his boss and not because of physical symptoms.  (R. 62-63).  The ALJ also noted

18

that CRNP Carol James did not indicate any opinion regarding the claimant's functional capacity and was not "an acceptable medical source" considering her role as a nurse practitioner.  (R. 63).

The ALJ recognized that the claimant's hypertension has been difficult to control at times; however, he also noted that the record shows that the claimant's hypertension has been "generally controlled" when the client is compliant in taking the medication.  (R. 63).  The ALJ noted that the client has a "history of non-compliance" that includes eating pork after being advised to eat a low salt diet in September of 2013.  (R. 63)

Regarding the claimant's neck and back pain, the ALJ stated that "the record as a whole indicates that the claimant has periodic and intermittent neck and back pain that is treated symptomatically, routinely, and conservatively."  (R. 63).  The ALJ pointed to a hospital visit in February 2012 where the claimant's described his back pain as "improving and occasional."  (R. 63).  The ALJ also pointed to two instances in 2013 where the claimant admitted not taking pain medication during the day and rarely taking a prescribed muscle relaxer.  (R. 63).

The ALJ noted Dr. Iyer's findings that the claimant did not appear to have significant physical impairments and had underlying conditions that may require "periodic evaluation and monitoring."  (R. 64).  Additionally, the ALJ ascribed some weight to Dr. Iyer's testimony, and stated that Dr. Iyer's "findings are consistent with and supported by the record."  In conclusion, the ALJ noted that he gave the claimant the "benefit of the doubt by limiting him to sedentary work."  (R. 64).

Regarding Dr. Singh's RFC assessment that the claimant could work at the medium exertion level, the ALJ stated that Dr. Singh's opinion "is entitled to little or no weight" because he found the record indicates that the claimant is more limited.  (R. 64).  The ALJ also indicated

that the State agency disability examiner's functional capacity assessment was not considered

because the examiner e is a Single Decision Maker.  (R. 64).

After assessing the entire medical record and based on the Vocational Expert's testimony,

the ALJ found that the claimant could not perform any past relevant work.  (R. 65).  The ALJ

concluded that the claimant had the residual functional capacity to perform the full-range of

sedentary work.  (R. 61).  Regarding the availability of jobs, the ALJ stated that a finding of "not

disabled is directed" by Medical-Vocational Rule 201.24 because of the claimant's RFC for the

full range of sedentary work.  (R. 65).  The ALJ also stated that the record did not support the

limitations that the claimant's attorney posed to the Vocation Expert.  (R. 65-66).  Thus, the ALJ

found the claimant was not disabled.

## VI. Discussion

*1. Substantial evidence supports the ALJ's finding that the claimant does not meet Listing 12.05.*

The claimant argues that the ALJ erred in finding that he did not meet Listing 12.05 based

on his verbal IQ score of 63.  However, the court disagrees and finds that substantial evidence

supports the ALJ's finding that the claimant does not have significant limitations in adaptive

functioning as demonstrated by his verbal IQ score of 63 and, thus, does not meet Listing 12.05.

For a claimant to be disabled under Listing 12.05, the claimant must have significantly

sub-average general intellectually functioning, have deficits in adaptive behavior, *and* have

manifested deficits in adaptive behavior before age twenty-two.  *See Crayton*, 120 F.3d at 1219.

Moreover, an ALJ is not required to based his findings regarding whether a claimant meets

Listing 12.05 on IQ scores alone, but should make that determination based on an evaluation of

the medical record and the claimant's daily activities.  *See Popp*, 779 F.2d at 1499-1500.

Although a verbal IQ score between 60 and 70 , along with an additional mental or physical impairment that significantly limits the ability to work, creates a presumption of disability under Listing 12.05(C), an ALJ can overcome that presumption if the IQ scores are inconsistent with the claimant's daily activities and behavior.  *Id*.

In the present case, the claimant has a verbal IQ score of 63, and therefore, is presumptively disabled under Listing 12.05(C).  However, this court finds that substantial evidence supports the ALJ's determination that the claimant's lack of sufficient deficits in adaptive functioning or behavior overcome that presumption.  In making this determination, the ALJ pointed to the claimant's full scare IQ score of 76, and noted that the claimant had only one score between 60 and 70, which was more indicative of a learning disability.  The ALJ also noted Dr. Storjohann's conclusion that the claimant's abilities are in the borderline range of intelligence, and that the claimant's verbal IQ score of 63 shows he has "limited overall reading skills."

The ALJ, in specifically addressing the claimant's lack of deficits in adaptive functioning, noted his ability to work at substantial gainful activity for years; his involvement in a committed relationship that involves the care of his children; and the lack of evidence in the record showing any sustained limitation because of intellectual functioning.  Additionally, the ALJ referenced the claimant's Function Report and noted that the claimant's "activities of daily living are not significantly restricted by intellectual functioning."  (R. 61).  Although the claimant only completed tenth grade and was in EMR classes, the claimant admitted in his Function Report that he can pay bills, count change, handle a savings account, use a checkbook, can pay attention for fifteen to twenty minutes at time, and can follow written and verbal instructions well.

The court agrees with the ALJ that the record does not show that the clamant has the requisite deficits in adaptive functioning to meet Listing 12.05(C).  As such, the ALJ did not err in finding that the claimant did not meet Listing 12.05(C).

*2. The ALJ did not disregard Dr. Storjohann's opinion or substitute his own.*

The claimant argues that the ALJ substituted his own opinion in place of Dr. Storjohann's opinion, constituting reversible error.  *See Hillsman v. Bowen*, 804 F.2d at 1182.  However, in the present case, the ALJ stated that "*[c]onsistent* with Dr. Storjohann's conclusion, the undersigned finds that the claimant has the non-severe impairment of borderline intellectual functioning."  (R. 61) (emphasis added).  Dr. Storjohann found that the claimant had borderline intellectual functioning and limited reading skills.  The ALJ never refutes these findings, and rather endorsed them in finding that the claimant does have a non-severe impairment of borderline intellectual function.

In light of the ALJ's endorsement of Dr. Storjohann's evaluation, the ALJ did not substitute his opinion for Dr. Storjohann's and committed no reversible error.

*3. The ALJ incorporated the Psychiatric Review Technique's "mode of analysis" in assessing the claimant's depression.*

The claimant argues that the ALJ failed to complete a Psychiatric Review Technique Form (PRTF), and, thus, committed reversible error.  However, the law does not require the ALJ to fill out a PRTF and attach it to his decision if he incorporates the form's "mode of analysis" into his decision.  *See Moore*, 405 F.3d at 1214.

In the present case, the ALJ did exactly what the law requires: he incorporated the PRT's "mode of analysis" into his decision in addressing the claimant's depression.  He specifically

22

found that the claimant's depression caused no limitations in activities of daily living; social functioning; or concentration, persistence, or pace. He also found that the claimant had no episodes of decompensation. (R. 59-60).

Because the ALJ incorporated the PRT's "mode of analysis" in his decision and substantial evidence supports his findings, the court finds that he committed no reversible error.

*4. Substantial evidence supports the ALJ's use of the Medical-Vocational Grids without posing a hypothetical to the Vocational Expert.*

The claimant argues that the ALJ erred by failing to pose a hypothetical to the Vocational Expert regarding whether jobs existed in significant numbers that the claimant could perform. The court disagrees and finds that the ALJ properly relied exclusively on the Medical-Vocational Grids in making his disability determination.

An ALJ can rely solely on the Medical-Vocational Grids to prove work in the national economy exists in significant numbers that the claimant can perform *if* the claimant can perform a full range of work at the given level *and* has no nonexertional limitations that significantly limit basic work skills. *Jones*, 190 F.3 at 1228-29; *see also Jordan*, 470 F. App'x at 770. Although having borderline intellectual functioning is a *factor* the ALJ should consider to determine if the claimant has nonexertional limitations that significantly limit basic work skills, a mere diagnosis of borderline intellectual functioning does not equate to such a finding. *See Jordan*, 470 F. App'x at 770.

In the present case, the ALJ found that the claimant had a non-severe impairment of borderline intellectual functioning. The ALJ relied on Dr. Storjohann's evaluation and concluded that the claimant's borderline intellectual functioning "constitutes, at most, only a slight abnormality . . . and certainly has not interfered with the claimant's ability to perform basic

unskilled work activities." (R. 61).  In finding that his borderline intellectual functioning did not significantly limit the claimant's work skills, the ALJ noted that the claimant worked for a period of years at  substantial gainful employment at the unskilled level.

The court finds that substantial evidence supports the ALJ's findings that the claimant's borderline intellectual functioning did not significantly limit his basic work skills and that he could perform a full range of work at the sedentary level.  As such, the ALJ did not err in applying the Medical-Vocational Grids to show that work exists in significant numbers in the national economy that the claimant can perform.

### VII. Conclusion

For the reasons as stated, this court concludes that the ALJ applied the proper legal standards and that substantial evidence supported his finding that the claimant is not   Therefore, the Commissioner's finding that the claimant is not disabled is due to be AFFIRMED.

The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 21st day of September, 2016.

_Karon O. Bowdre_
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE